# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

MATTHEW McELWAIN,

       Petitioner,

v.                                CASE NO:  8:07-CV-1603-T-30MAP

SECRETARY, DEPARTMENT OF
CORRECTIONS and ATTORNEY
GENERAL, STATE OF FLORIDA,

       Respondents.

_____/

# ORDER

THIS CAUSE is before the Court upon the petition of Matthew McElwain (hereinafter "petitioner" or "McElwain"), an inmate in the Florida penal system proceeding *pro se*, for a writ of habeas corpus pursuant to 28 U.S.C. §2254 (Dkt. #1), the State's response (Dkt. #11), and Petitioner's reply (Dkt. #14).  Upon review, the Court determines that the petition should be denied because it fails to meet the requirements of 28 U.S.C. §2254(d) and (e).

## PROCEDURAL BACKGROUND

The parties agree on the procedural history of the case which is described by the State as follows:

> McElwain was found guilty after a jury trial of aggravated battery and robbery as charged in case no. 99-17320.  On December 7, 2000, McElwain was adjudicated guilty in accordance with the verdicts and initially sentenced as a violent career criminal.  On December 7, 2000, he was resentenced as a habitual violent felony offender to 30 years prison along with a ten-year

minimum mandatory prison term, on each count. The sentences ran concurrently. (Footnote omitted.)

McElwain appealed his trial-based judgment, and after briefing, on July 10, 2002, the state district court affirmed without written opinion in case no. 2D01-1684. McElwain v. State, 825 So. 2d 386 (Fla. 2nd DCA 2002) [table]. He did not seek rehearing; nor did he pursue certiorari review in the United States Supreme Court.

McElwain filed a pro se motion for postconviction relief dated July 11, 2003, under Florida Rule of Criminal Procedure 3.850 in which he raised some sixteen claims for relief. A number of claims were summarily denied by nonfinal order rendered December 22, 2003. An evidentiary hearing was held May 17, 2005, on the outstanding rule 3.850 claims. By final order rendered July 14, 2005, the postconviction court denied the grounds on which the probe was held. Following denial of rehearing, McElwain appealed. After briefing, the state district court on August 22, 2007, per curiam affirmed without written opinion in case no. 2D05-4697. McElwain v. State, 963 So. 2d 237 (Fla. 2nd DCA 2007) [table]. The mandate issued September 12, 2007.

By then, McElwain had filed a pro se motion to correct illegal sentence under Florida Rule of Criminal Procedure 3.800(a) on May 15, 2006. By 3.800 order June 1, 2007, the postconviction court directed resentencing. McElwain was furnished appointed counsel, and after hearing arguments on August 10, 2007, the state court by order rendered September 7, 2007, granted the rule 3.800(a) motion in part to the extent resentencing was afforded McElwain. Furnishing the state with another opportunity to establish the criteria for McElwain's treatment as a habitual felony violent offender, the state court resentenced him to the same habitual disposition, nunc pro tunc to November 30, 2000. McElwain's ensuing appeal in case no. 2D07-4061 is currently pending as a plenary appeal, to include review of the resentencing.

McElwain timely filed this petition on September 7, 2007.

## FACTUAL BACKGROUND

This case involves an incident that took place in the late night hours of October 2, 1999. According to the State's witnesses, Jimmy Lee Collette, a homeless person who worked part-time for Wilhelm Air Conditioning, went to sleep in a sleeping bag behind

Wilhelm Air Conditioning. While he was asleep, he was kicked in the face, breaking his nose and neck. The blow knocked him out, but when he regained consciousness, he went across the street to a neighbor's house to have the rescue squad called. He realized at that time that his wallet was missing with the $10 he had in it. He had surgery to repair his broken nose and neck, and the surgery on the nose left a permanent scar.

Deputy David Everts responded to the call along with his training officer. Deputy Everts said that Collette's face was "covered with blood, blood in his hair, a puddle of blood where he was laying." (Transcript, volume III, p. 211, l. 6) The neighbor described a vehicle that was seen leaving the area so Deputy Everts put out an alert for officers in the area to look for the vehicle. The vehicle was found about five blocks away where it had run out of gas. In the truck were Johnny O'Dell and the Petitioner, Matthew McElwain. Johnny's girlfriend, Debbie Jones, now Debbie O'Dell, was found walking back to the truck with gas.

Johnny and Debbie O'Dell told the officers that they were acquaintances of Jimmy Lee Collette. They said that they knew he slept behind Wilhelm Air Conditioning, worked part-time, and sometimes had cash. They were riding around that evening with Matthew McElwain and wanted money to purchase crack cocaine. Johnny and Debbie O'Dell drove Matthew McElwain to Wilhelm Air Conditioning and then waited nearby at the Farm Store. A few minutes later, Matthew McElwain came running back to the truck with a wallet in his hand. McElwain said that he had to hit Collette to get his wallet. He got in the truck, went through the wallet and said there was only $10 in it. He took out the money and threw the

wallet and its other contents out the window as the truck was driving down the road.

The defense did not call any witnesses but McElwain's version of the events came into evidence through his statements made to the police officers. Deputy Everts said the first statement was made at the scene of the arrest. Everts' testimony was as follows:

Q:     And what did he tell you happened?

A:     He just told me that he went back to the residence of Mr. Collette, where he was staying at. He went back there and kicked him in the face and took his wallet and discarded his wallet. And at that time he mentioned something about a knife. When we got into the knife issue, he went ahead and told me, "Just don't worry about it."

Q:     And that's all he said to you out at the scene?

A:     That was it.

(Transcript, volume III, p. 219, l. 20)

Later, at the Sheriff's Office, McElwain gave a tape recorded statement to Corporal Somellan. The taped statement was entered into evidence through the testimony of Corporal Somellan:

CPL. SOMELLAN:     Now the first thing we are going to do is talk a little bit about what happened tonight, which would be – or last night Saturday night into Sunday morning. You were with who tonight?

THE DEFENDANT:     I don't really know their names. I know Debbie Jones and I don't know --

CPL. SOMELLAN:     You don't know the other boy's name? The other man's name?

THE DEFENDANT:     No.

CPL. SOMELLAN:     Okay. That's fine. You were all there in what kind of a truck?

| | |
|---|---|
| THE DEFENDANT: | Ford pick-up step side. |
| CPL. SOMELLAN: | Describe the color of that truck for me. |
| THE DEFENDANT: | I believe it was brown with some blue fenders on it. |
| CPL. SOMELLAN: | Okay. It had primer on it? |
| THE DEFENDANT: | I don't know about that. |
| CPL. SOMELLAN: | On the side? Okay. Tell me where you went, what occurred, what happened, why did it occur? |
| THE DEFENDANT: | Well, the last four days I have been smoking this crack. The shit's killing me. And I really need to get some help. Now, I'm sitting here straight and reality is hitting me and I really know that I need help. |
| CPL. SOMELLAN: | Tell me a little bit about what happened. What did you do in order to obtain some money for this stuff? |
| THE DEFENDANT: | I was drinking, sitting around drinking and somehow or another the man started to say something about one of us owing him money or something. |
| | And he pulled out a knife and things just started – one thing led to another and that's what that crack cocaine does. |
| CPL. SOMELLAN: | Did you take the man's wallet? |
| THE DEFENDANT: | I don't think I – I don't really know. |
| CPL. SOMELLAN: | Okay. Did you take anything from him? |
| THE DEFENDANT: | No. See, I don't really think – I don't really know. |
| CPL. SOMELLAN: | Okay. When he pulled this knife, what did you do? |
| THE DEFENDANT: | I think I hit him. I'm not sure. |
| CPL. SOMELLAN: | Where did you hit him at? |

THE DEFENDANT:        I think on the head or something.

CPL. SOMELLAN:        Do you know this man?

THE DEFENDANT:        No, sir, I don't.

CPL. SOMELLAN:        Do you know him by his first name or anything at all?

THE DEFENDANT:        No, sir.

CPL. SOMELLAN:        Where was he?

THE DEFENDANT:        At an air conditioning place.

CPL. SOMELLAN:        Do you know the name of the air conditioning place?

THE DEFENDANT:        No, sir, I sure don't.

CPL. SOMELLAN:        What did the man look like?

THE DEFENDANT:        I couldn't even tell you. I have been on that – I've been up for four days and spent about $12,000 in these four days. And it just really makes you do things that you are remorseful for when you are done doing it.

                      I really need to get some help and get this problem that I have with the crack taken care of. I really need help.

CPL. SOMELLAN:        Do you think this crack problem led you to striking this man tonight?

THE DEFENDANT:        No. Well, yes and no. It's drinking and the crack as well, probably, yes.

CPL. SOMELLAN:        I was told by a – back in the truck after this incident, you went down the street and the man's wallet was thrown out or whatever and $10 was taken.

THE DEFENDANT:        I don't know anything about that.

CPL. SOMELLAN:        Okay. Obviously --

THE DEFENDANT:     I can't really tell you much because I was so cracked out.  I just – it gets you.  After you've been up a few days and you get delirious and you're hallucinating.  You don't know what's going on.

CPL. SOMELLAN:     But after you hit the man, do you recall taking his wallet for the crack problem?

THE DEFENDANT:     No, sir, I don't.

MR. SELKEY:     This air conditioning place, where is it located?

THE DEFENDANT:     In Ruskin.

MR. SELKEY:     You know what road?

THE DEFENDANT:     I think Shell Point.

MR. SELKEY:     And this gentleman, where was he located?  In the front, the back, inside the building?  Where?

THE DEFENDANT:     We were on the side or something like that.  I don't really recall totally.  I was delusional and hallucinating from the crack.  I really have a severe problem and I need to get some help with this.

There's something that has got to be done for me.  I really have to get some help for this.  I am really very sorry whatever happened tonight.  I'm not sure what all happened, but I'm very sorry for what did happen.

CPL. SOMELLAN:     Did the man back at the air conditioning place, why did you strike him?

THE DEFENDANT:     He – we were drinking and he started an argument.  He pulled out a knife.  And one thing led to another.  I'm not sure what all happened.  I got the heck out of there real fast.  I didn't want to get stabbed with any knife.

CPL. SOMELLAN:     At what point did you hit him?

| | |
|---|---|
| THE DEFENDANT: | I'm not even sure. |
| CPL. SOMELLAN: | Did you hit him? |
| THE DEFENDANT: | If I did. I don't believe. |
| CPL. SOMELLAN: | Did you hit him before he had the knife or after he had the knife? |
| THE DEFENDANT: | I believe he had the knife on me already. He going to cut me with this knife. |
| CPL. SOMELLAN: | That's when you defended yourself and hit him? |
| THE DEFENDANT: | It's possible, yes, sir. |
| CPL. SOMELLAN: | Okay. Who was with you there? |
| THE DEFENDANT: | The people I was with in the truck earlier. |
| CPL. SOMELLAN: | They were with you when this man pulled a knife out on you, too? |
| THE DEFENDANT: | Yes, they were. |
| CPL. SOMELLAN: | So, they'd seen the man pull a knife out on you? |
| THE DEFENDANT: | Yes, sir. |
| CPL. SOMELLAN: | And they had seen you defend yourself and hit the man back with the knife? |
| THE DEFENDANT: | I don't really recall all of that that took place. I have been up for four days on crack. I have a severe problem and I really need to get some help. I am just delirious. I have been up for so long. |
| CPL. SOMELLAN: | Did you feel threatened before you struck him? |

| THE DEFENDANT: | Yes, I did.  I – he had this knife that was probably eight inches or a little longer.  He was saying he was going to cut my motherfucking ass.  I do remember this, even though I was cracked out. |
|---|---|
| CPL. SOMELLAN: | And Debbie and the other thin fellow was there with you? |
| THE DEFENDANT: | Yes. |
| CPL. SOMELLAN: | They heard all of this happen? |
| THE DEFENDANT: | They were arguing with each other at the time.  I am sure they did catch some of it.  I think that I would like to stop the tape now. |
| CPL. SOMELLAN: | Okay. |
| THE DEFENDANT: | I'm really very sorry for the things that's happened.  I know when I'm in my right mind, that there's no possible way, because I'm a kind-hearted person, just like any other human being. |
| | The crack cocaine just rules your life.  It just takes over.  And it's something you just can't control.   I have got to have some help for this. |

(Trial transcript, volume III, p. 259, l. 4 - p. 266, l. 9)

## THE PRESENT PETITION

In his petition now before this Court, McElwain raises the following grounds:

1.      Actually innocent, based on newly discovered evidence.

2.      Ineffective assistance of counsel

(1)      Trial counsel was ineffective when he failed to object to the trial court's

failure to place the prospective jurors under oath prior to voir dire

examination, thereby depriving the court of subject matter jurisdiction

and the Petitioner of his constitutional right to an impartial jury.

(2)     Trial counsel was ineffective by failing to solicit (sic) testimony and

evidence of the alleged victim's propensity and conviction for use of

a knife in an aggravated battery.

(3)     Trial counsel was ineffective by failing to call the following witnesses:

Deputy Sherry Hart, Deputy Selkey, and Celinda Rodriguez.

(4)     Trial counsel was ineffective by failing to produce medical records and

testimony that the alleged victim's broken neck was inconsistent with

the injury to the alleged victim's nose.

3.     Prosecutorial misconduct.

(1)     The prosecutor knowingly committed a <u>Giglio</u> violation by allowing

false testimony concerning a car battery and the version of events as

testified to by all the witnesses for the state.

(2)      The prosecutor withheld the fact that it (the State) made a deal with

Johnny and Debbie O'Dell that they would not be charged with the

crimes in return for favorable testimony against the Petitioner.

(3)     The prosecutor used threats of perjury to manipulate false testimony

from Johnny and Debbie O'Dell.

4.     Petitioner was denied a fair trial and due process because of the accumulation

of errors and admissions from the ineffective assistance of counsel and

prosecutorial misconduct.

# SECTION 2254 THRESHOLD

Since Petitioner's conviction was entered after the enactment of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), his petition is subject to the provisions thereof. When a federal court is asked to review a criminal conviction from state court, 28 U.S.C. §2254 places a heavy burden upon the petitioner. Habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim resulted in a decision that:

> (1)   was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or
>
> (2)   was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. §2254(d); Williams v. Taylor, 529 U.S. 362 (2000).

> In Williams v. Taylor, 529 U.S. 362, the Supreme Court held:
>
> Under the "contrary to" clause, a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Additionally, federal habeas relief is available under the "unreasonable application" standard only if the state court's application of clearly established federal law was "objectively unreasonable." Parker v. Head, 244 F.3d 831, 835 (11th Cir. 2001).

In a proceeding under the second standard (an unreasonable determination of the facts), a state court's determinations of fact shall be "presumed to be correct," and the habeas petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. §2254(e)(1). This statutory presumption of correctness applies only to findings of fact made by the state court, not to mixed determinations of law and fact. McBride v. Sharpe, 25 F.3d 962, 971 (11th Cir. 1994).

**Ground One:** **Actually innocent, based on newly discovered evidence.**

In support of ground one, Petitioner contends that the victim, Jimmy Lee Collette, recanted his testimony after the trial. Mr. Collette signed an affidavit at the request of Petitioner's father and brother stating that his neck was not broken during the incident in question but was broken later when he fell down some steps and that he did not know who committed the crime.

As a threshold matter, it should be noted that a claim of this sort is not cognizable in a federal habeas corpus petition. A claim of newly discovered facts after a trial is concluded goes to the factual basis of the conviction and is not a claim that Petitioner's constitutional rights were violated. Herrera v. Collins, 506 U.S. 390, 400 (1993) ("the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus . . . [because] federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution – not to correct errors of fact."); see also Brownlee v. Haley, 306 F.3d 1043 (11th Cir. 2002). Other than conclusory statements, McElwain makes no allegations of independent constitutional violations to support this

claim.

Further, the state court held an evidentiary hearing on this issue. As Petitioner acknowledges and as the trial court found at the evidentiary hearing, and as the trial court stated in its written order, Mr. Collette testified at the hearing that he had lied on his affidavit, and, in fact, his trial testimony was correct. He further stated at the hearing that he had been threatened by the Defendant's father and brother. And Defendant's father and brother paid Mr. Collette $100 to sign the affidavit recanting his trial testimony. Based on this testimony, the state court was well within its discretion in determining that the signed affidavit was not "newly discovered evidence."

Ground one fails because Petitioner has not shown that the state court's decision was contrary to, or involved an unreasonable application of clearly established Supreme Court law or was an unreasonable determination of the facts in light of the evidence presented. Ground one will therefore be denied.

**Ground Two:**        **Ineffective assistance of counsel.**

To establish a prima facie claim of ineffective assistance of counsel, Petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668 (1984). Deficient performance is performance which is objectively unreasonable under prevailing professional norms. Strickland, 466 U.S. at 688. Prejudice results when there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. Both prongs (deficient performance and prejudice)

must be shown before a petitioner is entitled to habeas relief.  The Eleventh Circuit has held that when applying <u>Strickland</u>, a federal district court may dispose of ineffectiveness claims on either of the two prongs without the necessity of discussing the other.  <u>Oats v. Singletary</u>, 141 F.3d 1018 (11th Cir. 1998).

**<u>Ground Two:</u>**          **(1)          Trial counsel was ineffective when he failed to object to the trial court's failure to place the prospective jurors under oath prior to voir dire examination, thereby depriving the court of subject matter jurisdiction and the Petitioner of his constitutional right to an impartial jury.**

In support of this ground, Petitioner states that he "was present at all stages of his trial and states that he did not voluntarily absent himself from any portion of the jury selection process, and to his knowledge, no oath was administered to the prospective jurors nor does the record of trial reflect any oath being administered."  Because of this, "without the prescribed oath, there is no due process assurance that the jury was impartial, (and) the trial judge's failure to swear and/or to delegate the administration of the required oath to a deputy clerk prior to voir dire is a failure to complete the court . . . ."

Petitioner has not demonstrated that the prospective jurors were not sworn.  He has only demonstrated that they were not sworn in his presence.  As he seems to acknowledge in his argument, it is customary practice in many state courts to have a member of the Clerk's office swear the entire jury pool before individual veniremen are selected to be sent to any individual courtroom for voir dire examination.  <u>See</u> <u>Martin v. State</u>, 898 So.2d 1036, <u>rev.</u> <u>denied</u>, 911 So. 2d 98 (Fla. 2005).  Knowing this, it would not be deficient performance for a trial lawyer to not object to the veniremen not being sworn in open court prior to voir dire.

Therefore, Petitioner has failed to meet the deficiency prong under <u>Strickland</u>.

Petitioner also fails to satisfy <u>Strickland</u>'s prejudice prong. While Petitioner argues that his counsel's failure to object to the voir dire oath not being administered permitted two women (jurors one and nine) to withhold their true feelings of guilt towards the Petitioner without fear of penalties of perjury, he points to nothing in the record to indicate they did not have a fear of perjury or that they in any way did not tell the truth in answering questions. And he points to nothing in the record to support his conjecture that the outcome of the trial would have been different had the veniremen been sworn in open court prior to voir dire. Therefore, Petitioner has failed the prejudice prong under <u>Strickland</u>.

For the foregoing reasons, this ground will be denied.

**<u>Ground Two:</u>**  (2)  **Trial counsel was ineffective by failing to solicit (sic) testimony and evidence of the alleged victim's propensity and conviction for use of a knife in an aggravated battery.**

In support of this ground, Petitioner states "trial counsel asserted self-defense to the jury as a defense to the aggravated battery charge in this case. Counsel was well aware of the alleged victim's conviction and fifteen (15) year state prison sentence for stabbing another man in the chest. Evidence of the victim's violent character is admissible, when the Petitioner's defense is self-defense, and Petitioner has asserted that the victim was the aggressor. <u>See</u> Section 90.404(1)(b), Fla. Stat."

Petitioner faults his counsel for not placing into evidence specific acts the victim committed on a prior occasion. Generally, evidence regarding a victim's character is inadmissible. But Section 90.404(1)(b) provides an exception allowing evidence of a

victim's character, under appropriate circumstances, to be admitted either by reputation evidence or by specific act evidence.  The Florida law on this issue, and the circumstances under which such evidence may be admitted, is described in <u>Grace v. State</u>, 832 So.2d 224, 225 (Fla. 2nd DCA 2002):

> There is a distinction between reputation evidence and evidence of specific acts admitted under Section 90.404(1)(b).  (<u>Pino v. Koelber</u>, 389 So. 2d 1191, 1194 (Fla. 2nd DCA 1980)).  While reputation evidence may be offered to corroborate the defendant's testimony by showing the victim's propensity towards violence, specific act evidence is only admissible to prove the reasonableness of the defendant's apprehension.  (Citations omitted).
>
> As a foundation for the admission of specific act character evidence, there must be evidence of some overt act by the victim around the time of the crime that reasonably suggested the need for self defense. (Citations omitted). <u>There must also be evidence that the defendant knew of the specific acts of violence.</u> <u>State v. Smith</u>, 573 So. 2d 306, 318 (Fla. 1990); <u>Smith v. State</u>, 606 So. 2d 641, 643; <u>Williams v. State</u>, 252 So. 2d 243, 247 (Fla. 4th DCA 1971).  "The reason for the required predicate is that without some evidence of an act by the [victim] that would reasonably suggest the need for self-defense, there would be no issue of self-defense to which evidence of the [victim's] violent character could be relevant."  <u>Williams</u>, 252 So. 2d at 247.

(Emphasis supplied).

At the time of the incident in question, Petitioner did not know Mr. Collette (see taped statement) and did not know he had previously stabbed someone with a knife (see transcript of May 17, 2005 hearing, pp. 22-23).  Specific act evidence is not admissible if a defendant does not know of the specific acts of violence at the time of the act of self-defense.  At the evidentiary hearing on his post-conviction motion, Petitioner admitted that he did not learn of Collette's prior violence until after his trial was over.  His lawyer had obtained the information in preparation for trial, but was unable to use it because it was not admissible.

Obviously, it is not deficient performance to fail to offer into evidence facts that are inadmissible.

This ground fails because there is no showing of deficient performance on the part of trial counsel.

**<u>Ground Two:</u>**      **(3)**      **Trial counsel was ineffective by failing to call the following witnesses: Deputy Sherry Hart, Deputy Selkey, and Celinda Rodriguez.**

In support of ground two (3), Petitioner argues:

Deputy Hart would have testified that Deputy Everts never saw three suspects prone on the ground, that he (Deputy Everts) never interviewed Debbie O'Dell at the scene of arrest, and that Deputy Everts never Mirandized all three suspects and that Deputy Everts at no time conducted the investigation. Deputy Hart would have also testified as she did in her deposition that Debbie O'Dell stated at the scene of arrest that she knew nothing about any robbery/assault.

Deputy Selkey would have testified that he was riding with Deputy Everts in the capacity of training officer and that upon their arrival at the scene of arrest, all three suspects were not in the prone position on the ground. That both Debbie and Johnny O'Dell were in two other patrol cars. That no officer with only ninety (90) days on the job is allowed to take control of an investigation, nor did Deputy Everts read all three suspects <u>Miranda</u> warnings. That Deputy Everts only handcuffed the petitioner, behind petitioner's back, but later, with Deputy Selkey's approval, recuffed petitioner in front so petitioner could smoke a cigarette. That at no time while at the scene of arrest did Deputy Everts communicate to him (Deputy Selkey) or any other deputy that the petitioner had in fact confessed. That the only part of Deputy Everts' testimony that could be relied on as being fact was Deputy Everts' testimony that he (Everts) transported the petitioner to the sub-section and from there to the county jail. Deputy Selkey would have also testified that all trainees are trained to retain all notes relevant to an arrest and/or confession to a crime because these notes are fundamental in writing reports.

Celinda Rodriguez would have testified that on October 2, 1999, around 11:00 p.m. or 11:30 p.m. she saw Johnny and Debbie O'Dell pull into where the

alleged victim was staying, and that the petitioner was not with the O'Dells, and twenty minutes later the battered victim was at her door seeking help, and informed Ms. Rodriguez that Johnny and Debbie O'Dell are the ones whom (sic) beat and robbed him (Mr. Collette). Ms. Rodriguez would have also testified that Debbie O'Dell was trading sex for drugs from Mr. Collette the alleged victim.

This testimony would have proven Mr. McElwain's claim of actual innocence. There is a reasonable probability that had the jury, who had the right to hear this testimony heard it, they would have found the defendant not guilty.

Deputies Hart and Selkey were not called as witnesses by the prosecution. Petitioner faults his trial counsel for not calling them as witnesses for the defense. Petitioner contends that inconsistencies in the testimony of the officers would have caused the jury to find him not guilty. At the outset, the Court notes that defense counsel are often leery about calling police officers as witnesses for the defense because they can easily do more harm than good from a defense perspective.

The trial court had an evidentiary hearing on these claims. The state trial court pointed out that, "in claims involving ineffective assistance of counsel for failure to investigate and interview a witness, a facially sufficient motion should include (1) the prospect of witnesses' identity; (2) that the prospective witness would have been available to testify at trial; (3) the substance of the prospective witnesses' testimony; and (4) an explanation as to how the omission of the prospective witnesses' testimony prejudiced the outcome of the trial." Nelson v. State, 875 So. 2d 579 (Fla. 2004). At the evidentiary hearing, Petitioner admitted that he did not tell his trial lawyer about Deputy Hart or any contradictions or inconsistencies in her testimony from that of Deputy Everts. As for Deputy

Selkey, Petitioner fails to state where the record shows how Deputy Selkey would have testified.  Even so, assuming they would have testified as claimed by Petitioner, the inconsistencies are minor.

For example, whether the three suspects were lying prone on the ground when Deputy Everts arrived, is a minor detail when the overall issue was whether Petitioner struck Mr. Collette only in self-defense.  Deputy Everts testified that he had questioned Petitioner in the back seat of his patrol car with no one else present.  It would not be inconsistent, therefore, for other deputies to say that they did not hear the <u>Miranda</u> warnings or the confession.  It is also a minor detail that Deputy Hart would have testified that Debbie O'Dell stated at the scene of arrest that she knew nothing about any robbery/assault.  On cross-examination, Debbie O'Dell herself admitted that she had initially denied any knowledge about the robbery and, in fact, had told several different versions of what happened that night.  Likewise, any testimony about how and when Petitioner was handcuffed was a rather unimportant detail to the main issue before the jury – whether McElwain struck Collette in self-defense.

McElwain does not contend that he did not make the statements attributed to him by Deputy Everts.  Further, he does not contest the taped statement that was played to the jury.  And, he does not contest the fact that he was the one that delivered the blow that broke the victim's nose.

As to Celinda Rodriguez, Mr. Collette's neighbor, it is understandable why a lawyer would not have called her as a witness.  While Petitioner contends that she would have

testified that she saw the O'Dells drive up to the air conditioning building shortly before the incident but did not see him, that testimony would have been of little help. Ms. Rodriguez, in her statement attached to the petition stated that, while she did not see McElwain in the truck at the time of the incident, she had seen him with the O'Dells earlier on the day of October 2nd, and saw him with the O'Dells at the time of the arrest immediately after the incident. There is no question that he was with the O'Dells that night because all three were arrested together. And, once again, it is of little help to suggest that Ms. Rodriguez could have helped prove that he was not present at the time of the incident because he admitted as much in his taped statement.

The state trial court ruled that trial counsel was not ineffective for failing to call these witnesses at trial. This ruling was neither an unreasonable application of clearly defined Supreme Court law nor an unreasonable determination of facts from the evidence before it. There is no showing that the calling of these witnesses would have made any difference in the outcome of the case. This Court agrees with the state court that the failure to call these witnesses was neither deficient performance on the part of trial counsel nor has it been demonstrated to be prejudicial to the outcome of Petitioner's case. Therefore, this ground will be denied.

**Ground Two:** **(4)** **Trial counsel was ineffective by failing to produce medical records and testimony that the alleged victim's broken neck was inconsistent with the injury to the alleged victim's nose.**

In support of this ground, Petitioner states:

The alleged victim testified at trial that the injuries suffered as a result of the alleged battery and robbery were a broken nose that required surgery and a neck injury that resulted in surgery and pins being placed in the upper spinal cord.

Trial counsel had medical records that showed that the alleged victim's broken neck was not caused by a blow to the nose yet failed to depose the alleged victim's attending physician, so he (trial counsel) could establish at trial that the victim's broken nose (sic) was not consistent with a blow to the nose.

The medical records to which Petitioner refers are not in the record before the Court. Without them, this Court is unable to verify what they contain in reference to the victim's injuries.

If the records fail to demonstrate the broken neck is unrelated to the blow to the face, then obviously Petitioner's argument fails. If the records do show the broken neck is unrelated, then such records could have been used as impeachment of Collette's testimony concerning his injuries during cross-examination, but they would not have undermined the state's prosecution of an aggravated battery charge. The evidence was undisputed that the victim received a severe blow to the face either from a kick or a fist. The victim's nose was broken and surgery was required, resulting in a scar. Florida defines aggravated battery as intentionally or knowingly causing great bodily harm, permanent disability, or permanent disfigurement. Sec. 784.045, Fla. Stat. Great bodily harm is something more than slight, trivial, minor or moderate harm, and something more than mere bruising. Guthrie v. State, 407 So. 2d 357 (Fla. 5th DCA 1981); McCormick v. City of Ft. Lauderdale, 333 F.3d 1234, 1239 (11th Cir. 2003) ("a profusely bleeding head wound . . . would not appear slight or trivial to a reasonable officer.") The injury in this case, without regard to the broken neck,

supports an aggravated battery conviction.

Since Petitioner has not supported this argument by placing the medical records into the record, his attorney's use of them cannot be evaluated. Thus, this argument fails the deficiency prong under <u>Strickland</u>. Assuming that the medical records do exist, their use as impeachment on the extent of the injuries would not be of sufficient force to change the outcome of the trial. Therefore, Petitioner would fail the prejudice prong of <u>Strickland</u> as well. Since this ground does not meet the <u>Strickland</u> test, it will be denied.

**<u>Ground Three:</u>         Prosecutorial misconduct.**

The appropriate place to raise prosecutorial misconduct at the state level is on direct appeal from the trial itself. McElwain did not do so. When he tried to raise this claim in his 3.850 motion, the state court summarily denied it as procedurally barred. That ruling was affirmed on appeal from the 3.850 Order and is therefore procedurally barred here. <u>Tower v. Phillips</u>, 7 F.3d 206 (11th Cir. 1993). Procedurally defaulted claims in state court are not reviewable by this Court unless the Petitioner can demonstrate cause for the default and actual prejudice, <u>Wainwright v. Sykes</u>, 433 U.S. 72 (1977), or establish the kind of fundamental miscarriage of justice occasioned by a constitutional violation that resulted in the conviction of a defendant who was "actually innocent." McElwain has not shown cause for the default or actual innocence.

Even if the claims were not defaulted, they would still fail for lack of merit. First, Petitioner argues that the prosecutor allowed false testimony concerning the return of a car battery. The Petitioner is apparently referring to the testimony of Johnny and Debbie O'Dell.

A prosecutor cannot require a witness to testify in a certain way - the witness is expected to tell the truth. If the witness does not tell the truth, he or she can be cross-examined and the inconsistency made apparent to the jury. That is exactly what happened at Petitioner's trial. Both Debbie O'Dell and Johnny O'Dell were cross-examined by Petitioner's trial counsel concerning the battery. (See Transcript, volume III, pp. 168-169 as to Debbie O'Dell, and p. 201 as to Johnny O'Dell.)

Second, Petitioner claims the prosecutor "withheld the fact that it (the state) made a deal with Johnny and Debbie O'Dell that they would not be charged with the crimes in return for favorable testimony against the Petitioner." Petitioner supports this conclusory statement by claiming that the incident in question took place in 1999 and as of the date of his filing his petition (September 10, 2007), the O'Dells have still not been charged and prosecuted for the robbery. Petitioner does not say how he knows this to be a fact. Further, Petitioner points to no record evidence of any such "deal." It is mere speculation on his part. The fact that neither Debbie nor Johnny O'Dell had been charged by the time of the trial was brought out on cross-examination by Petitioner's trial counsel. (See Transcript, volume III, pp. 167-168.) So, that fact was not hidden from the jury.

Third, Petitioner claimed that the prosecutor committed misconduct because he "used threats of perjury to manipulate false testimony from Johnny and Debbie O'Dell." Johnny and Debbie O'Dell both told several different versions of what happened the night the victim was robbed. Petitioner's trial counsel brought this out clearly on his cross-examination of each of them. Petitioner cites to no case supporting his claim that a witness being reminded

of the perjury statutes somehow violates his rights.

All of Petitioner's arguments in this ground are mere conclusory statements on Petitioner's part and are insufficient to merit habeas relief. Therefore, this ground will be denied.

**Ground Four:** **Petitioner was denied a fair trial and due process because of the accumulation of errors and admissions from the ineffective assistance of counsel and prosecutorial misconduct.**

"Cumulative error" is not a violation of the Constitution. Each individual claim must be addressed on its own merits. <u>Lorraine v. Coyle</u>, 291 F.3d 416, <u>amended on other grounds</u>, 307 F.3d 459 (6th Cir. 2002), <u>cert. denied</u>, 123 S.Ct. 1621 (2003). Here, each individual claim has been found to be without merit. Therefore, this ground will be denied.

## CONCLUSION

Having determined that all grounds lack merit, the petition must be denied.

It is therefore ORDERED AND ADJUDGED that:

1.     The petition for writ of habeas corpus (Dkt. #1) is DENIED.

2.     The Clerk is directed to enter judgment in favor of Respondents and against the Petitioner, terminate any pending motions, and close this file.

**DONE** and **ORDERED** in Tampa, Florida on January 30, 2009.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

<u>**Copies Furnished To**</u>:
Counsel/Parties of Record

*F:\Docs\2007\07-cv-1603.deny 2254.wpd*

Page 24 of 24